# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF MICHIGAN

**KIMBERLY BORCHARD, TIMOTHY DANA,
and HOLLY KOVACS,** Individually and
on behalf of all others similarly situated,

Case No:

Plaintiffs,                                    Hon.

vs.

**BOYCE HYDRO POWER, LLC, BOYCE HYDRO, LLC,
BOYCE MICHIGAN, LLC,
EDENVILLE HYDRO PROPERTY, LLC,
FOUR LAKES TASK FORCE, LEE W. MUELLER
and JOHN DOES 1-10**

Defendants.

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs **KIMBERLY BORCHARD, TIMOTHY DANA and HOLLY KOVACS**, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by way of this Class Action Complaint against Defendants **BOYCE HYDRO POWER, LLC, BOYCE HYDRO, LLC,** and **BOYCE MICHIGAN, LLC, EDENVILLE HYDRO PROPERTY, LLC,** ("Boyce Defendants"); **FOUR LAKES TASK FORCE** ("Four Lakes"); **LEE W. MUELLER; and JOHN DOES 1-10** ("collectively "Defendants") state as follows:

## NATURE OF THE CASE

1.    Plaintiffs, individually and on behalf of class members, bring this class action lawsuit pursuant to Fed. R. Civ. P. 23 against Defendants to recover damages, and obtain other remedies, arising from damage to their real and personal property and interference with their use and enjoyment of real property.  Specifically, as a result of the Edenville and Sanford dams failing on Tuesday May 19, 2020 Defendant caused the release of water onto class members' property in locations throughout Midland County, Michigan

2.    The breach was reported by Midland County 911 at 5:43pm and an immediate evacuation was ordered for residents of Sanford and Edenville, including residents of Midland living west of Eastman Road and south of U.S. 10.  Residents were told to go as far east and west of the Titabawassee River as possible.

3.    Images of one of the broken Dams was videotaped from an airplane flying                                   above                      Wixom                      Lake: https://www.facebook.com/rkaleto/videos/10100276786854416/?t=5

4.    The resulting release of water involved was immense, persistent and had catastrophic consequences to anything and everything in its way.  The resulting floodwaters were projected to reach 30 feet high.  Aerial pictures confirm the extent of the damage and affected area:





5.      Shelters for evacuees were set up at Meridian Junior High School and Coleman High School.  It was estimated that 10,000 people would be evacuated or affected.

6.      Power outages from the resulting floodwaters affecting approximately 2000 people.



7.      Governor Gretchen Whitmer declared a state of emergency, which was followed by the President of the United States of America doing the same.

8.      As a result of the floodwaters, affected residents suffered damage and loss to personal and real property, some were evacuated, and many lost the use and enjoyment of their real property, which continued for the days following and through the filing of the Complaint.

## JURISDICTION

9.      This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This is a class action in which the aggregate claims of the individual Class members exceed the sum value of $5,000,000 exclusive of interest and costs, there are believed to be in excess of 100 Class members, and all the class members of the proposed Class have a different

citizenship than the Boyce Defendants under the citizenship of limited liability company laws, and Nevada citizen Defendant Lee W. Mueller.

10.     The Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

11.     The Court also has diversity jurisdiction over Plaintiffs' claims pursuant to 29 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.00.

12.     Personal jurisdiction also applies to Defendants because Defendants have purposefully availed themselves of the privilege of conducting activities in the state of Michigan, including engaging in litigation in federal courts located in Michigan, as described below.  They have therefore established minimum contacts sufficient to confer jurisdiction over them; and the assumption of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the Constitutional requirements of due process.

## PARTIES

13.     **Kimberly Borchard** is a citizen of the state of Michigan who resides at 5373 N. Fox Road Sanford, MI  48567.

14.     **Timothy Dana** is a citizen of the state of Michigan who resides at 5373 N. Fox Road Sanford, MI  48567.

15.    **Holly Kovacs** is a citizen of the state of Michigan who resides at 331 W. Saginaw Road Sanford, Michigan  48657.

16.    Defendant **Boyce Hydro Power, LLC** is listed as a Domestic Limited Liability Company with the State of Michigan under ID No. 801237290; organized on July 1, 2003; and with a Registered Office address of 414 Townsend St, Ste 201, Midland Michigan 48640.  The company's office address is listed by various public websites as 6000 S M30 Edenville, Michigan 48620.[1]  Defendant Boyce Hydro Power filed a certificate of amendment to the articles of organization on July 1, 2003 which was signed by Defendant Lee W. Mueller. The LLC's name was changed from Synex Michigan, LLC on July 2, 2007.

17.    Boyce Hydro Power, LLC is managed by members, which includes, upon information and belief, and his own assertion in prior litigation, Defendant Lee W. Mueller, a citizen of the state of Nevada.

18.    For the purposes of establishing diversity jurisdiction, Defendant Boyce Hydro Power, LLC is a citizen of the state of Nevada because a limited liability company has the citizenship of its members. *See Homfeld II, L.L.C. v. Comair Holdings, Inc.*, 53 F. App'x 731, 732 (6th Cir. 2002) (unpub.) (citing

---

[1] http://www.energyjustice.net/map/displaycorporation-5771.htm; and
https://www.dnb.com/business-directory/company-
profiles.boyce_hydro_power_llc.2ceb6fd4d3ac8916d004ad4dfb92f92e.html (both last visited on May 22, 2020)

*Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir.1998)) ("limited liability company is not treated as a corporation and has the citizenship of its members"); *Vericorr Packaging, L.L.C. v. Osiris Innovations Group, LLC*, 501 F. Supp. 2d 989, 992 (E.D. Mich. 2007) (quoting *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004)) ("joining all other federal circuits 'that have answered this question . . . in the same way: like a limited partnership, a limited liability company is a citizen of any state of which a member of the company is a citizen.'").

19.    Upon information and belief, from July 12, 2007, through September 24, 2018, Defendant Boyce Hydro Power, LLC held the Federal Energy Regulatory Commission ("FERC") license to operate the Edenville Hydroelectric Project No. 10808, including the Edenville Dam which formerly impounded the Wixom Reservoir located in Gladwin County, Michigan.

20.    Upon information and belief, Defendant Boyce Hydro Power, LLC is the owner of the Edenville Dam and related hydro project.

21.    **Boyce Hydro, LLC** is listed as a Domestic Limited Liability Company with the State of Michigan under ID No. 801398139; organized on March 26, 2007; and with a Registered Office address of 414 Townsend St., Ste 201 Midland, Michigan 48640. Defendant Boyce Hydro, LLC's Articles of Organization were filed with the State of Michigan and signed by Defendant Lee W. Mueller.

22.    Boyce Hydro, LLC is managed by members, which includes, upon information and belief, Defendant Lee W. Mueller, a citizen of the state of Nevada.

23.    Defendant Boyce Hydro, LLC, is a citizen of the state of Nevada because for the purposes of establishing diversity jurisdiction, a limited liability company has the citizenship of its members. (*See* Case law cited in ¶ 18)

24.    Upon information and belief, Defendant Boyce Hydro, LLC operated the Edenville Dam, on behalf of Defendant Boyce Hydro Power, LLC, or Defendant Lee W. Mueller or both, during the term of Defendant Boyce Hydro Power, LLC's FERC license, which was revoked on September 24, 2018. Upon information and belief, Defendant Boyce Hydro Power continued to operate the Edenville Dam after the dam's FERC license was revoked.

25.    Defendant **Boyce Michigan, LLC** is listed as a Domestic Limited Liability Company with the State of Michigan under ID No. 801587758; organized on February 24, 2011; and with a Registered Office address of 414 Townsend St., Ste 201 Midland, Michigan 48640. Defendant Boyce Michigan's Articles of Organization were filed with the State of Michigan and signed by Defendant Lee W. Mueller.

26.    Boyce Michigan, LLC is managed by members, which includes, upon information and belief, Defendant Lee W. Mueller, a citizen of the state of Nevada.

8

27.     Defendant Boyce Michigan, LLC, is a citizen of the state of Nevada because for the purposes of establishing diversity jurisdiction, a limited liability company has the citizenship of its members. (*See* Case law cited in  ¶ 18)

28.     Upon information and belief, Defendant Boyce Michigan, LLC acquired and managed, on behalf of Defendant Boyce Hydro Power, LLC, or Defendant Lee W. Mueller or both, the Wixom Reservoir and Tittabawassee and Tobacco River bottomlands falling within the boundaries of the Edenville Hydro Project.

29.     Defendant **Edenville Hydro Property, LLC** is listed as a Domestic Limited Liability Company with the State of Michigan under ID No. 801354351 and with a Registered Office address of 414 Townsend St., Ste 201 Midland, Michigan 48640. Defendant Edenville Hydro Property, LLC's certificate of amendment to the articles of organization was filed on June 15, 2011 signed by Defendant Lee W. Mueller.

30.     Edenville Hydro Property, LLC is managed by members, which includes, upon information and belief, Defendant Lee W. Mueller, a citizen of the state of Nevada.

31.     Upon information and belief, Defendant Edenville Hydro Property, LLC, is a citizen of the state of Nevada because for the purposes of establishing diversity jurisdiction, a limited liability company has the citizenship of its members.

(*See* Case law cited in ¶ 18)

32.     Upon information and belief, Defendant Edenville Hydro Property, LLC filed permit applications related to the Edenville Dam and related hydro project on behalf of Defendant Hydro Power, LLC or Defendant Lee W. Mueller or both.

33.     Defendant **Lee W. Mueller** is a citizen of the state of Nevada and according to Nevada Secretary of State records, resides at 10120 W. Flamingo Road, Suite 4192, Las Vegas, NV 89147.[2]

34.     Upon information and belief, Defendant Lee W. Mueller has served as the principal Co-Manager solely responsible for the operations of Defendants Boyce Hydro Power, LLC; Defendant Boyce Hydro, LLC; Defendant Boyce Michigan, LLC; and Defendant Edenville Hydro Property, LLC.

35.     Upon information and belief, the Defendant Boyce Hydro, LLC; Defendant Boyce Michigan, LLC; and Edenville Hydro Property, LLC are legal entities whose sole purpose is to support the ownership and operation of the Edenville Dam on behalf of Defendant Boyce Hydro Power, LLC or Defendant Lee W. Mueller or both.

36.     Defendant **Four Lakes Task Force** is a Michigan non-profit and IRS 501(c)(3) organization.

---

[2] NEVADA SECRETARY OF STATE, AURORA CAMPAIGN FINANCE DISCLOSURES, LEE MUELLER, https://www.nvsos.gov/SOSCandidateServices/AnonymousAccess/CEFDSearchUU/Contributor Details.aspx?o=8n9MGV6MRdqS8pyvJCp1iA%253d%253d (last visited on May 22, 2020).

37.     **John Doe** defendants 1-10 include potentially, but as of yet, unknown entities or persons who face liability for the events and damages pleaded herein, including the other Co-Manager Member of Boyce defendants, the Boyce Trusts, and other licensee entities or owners of the Dams.[3]  Once the actual identities of any or all of the John Doe Defendants become known, Plaintiffs will amend this complaint to add them as party defendants.

## FACTS

38.     The catastrophe giving rise to this lawsuit involves the failure of several dams along the Tittabawassee River, the first of which was the Edenville Dam which failed — with the structure collapsing — at about 5:45 p.m. Tuesday May 19, 2020.

39.     The first affected area spanned both the Tittabawassee and Tobacco Rivers, including a 2,600-acre reservoir known as Wixom Lake, with a gross storage capacity of about 40,000 acre-feet and a 49-mile-long shoreline at full pool. Wixom Lake was emptied.

---

[3] The Edenville Dam was originally licensed to Wolverine Power Corporation on October 16, 1998. The license was transferred from Wolverine Power Corporation to Synex Michigan, LLC on June 23, 2004.5 Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC (licensee) and filed a statement with the Commission on July 12, 2007 to this effect.



40.     The Sanford Dam was next in line and also failed, resulting and expanding the flood area that reached all the way to Midland and beyond.



**A.**    <u>**The Dams and the May 19, 2020 Failure**</u>

41.    The 96-year-old Edenville Dam ruptured Tuesday after heavy rains, causing major flooding throughout portions of Midland County, forcing the evacuation of thousands.

42.    Midland County issued the below map for guidance on who should evacuate.



43.    The Edenville Dam, totals about 6,600 feet in length of earthen embankments and having a maximum height of 54.5 feet.

44.    Breaching of the Edenville Dam caused Wixom Lake to empty, and that water traveled towards Sanford Lake, increasing the amount of water passing through Sanford Dam, (collectively "Dams"). An alert from Midland County 911 at about 7:00 p.m. stated the failure of the Sanford Dam was imminent, and it also failed.

45.    By Tuesday, the Dams on Sanford and Wixom Lakes were no longer being able to control or contain the amount of water flowing through the spill gates.  These included the 69-foot-wide, 39-foot-high Tittabawassee spillway (also referred to as the Edenville spillway) is located on the eastern side of the project and contains three Tainter gates and two low-level sluice gates. And the Tobacco spillway, which is about 72 feet long and 72 feet wide with a crest height of about 40 feet, and contains three Tainter gates located on the western side of the project. The project creates a 0.4-mile-long bypassed reach on the Tobacco River that extends from the dam to the point where the Tobacco River meets the Tittabawassee River.

46.    The Edenville dam, often referred to as the Edenville Project, operated under license No. 10808 pursuant to section 31(b) of the Federal Power Act ("FPA"). The license includes terms and conditions concerning dam safety, property rights,

water quality, public recreation and safety, and other project purposes.

47. Public records indicate that the Edenville Project is licensed to and operated by Defendant Boyce Hydro Power, LLC who acquired the project and assumed responsibility as licensee in 2004. In addition to the Edenville Project, Defendant Boyce Hydro Power, LLC also owns and operates the Sanford Project No. 2875, Secord Project No. 10809, and Smallwood Project No. 10810.

48. In total, Defendant Boyce Hydro Power, LLC owns four dams on the Tittabawassee River, which runs southeasterly through mid-Michigan, emptying into the Saginaw River at Saginaw and which create Wixom, Sanford, Secord and Smallwood lakes.

49. The Boyce Defendants have a long history with U. S. Federal Energy Regulatory Commission ("FERC") and the Edenville Dam Project and its failing for 14 years to implement measures needed to protect public safety

50. For example, in 2017 a Compliance Order was issued to Boyce by the U. S. Federal Energy Regulatory Commission failing for 14 years to implement measures needed to protect public safety ("FERC") citing possible flood concerns:

> Boyce Hydro Power, LLC, licensee for the Edenville Hydroelectric Project No. 10808, is in violation of its license1 and the Commission's regulations for: 1) failing to increase the spillway capacity of the project; 2) performing unauthorized dam repairs; 3) performing unauthorized earth-moving activities; 4) failing to file an adequate Public Safety Plan; 5) failing to construct approved recreation facilities pursuant to the Commission's 2001 Order approving its Recreation Plan and for restricting public access; 6) failing to acquire all necessary project

property rights; and 7) failing to comply with the Commission's 1999 Order approving its Water Quality Monitoring Plan. As fully discussed below, the Commission's primary concern is the licensee's longstanding failure to address the project's inadequate spillway capacity. The Edenville dam has a high hazard potential rating, which means a failure of the project's works would create a threat to human life and/or would cause significant property damage.

51.     Federal regulators in 2018 revoked the hydropower generating license for the now collapsed Edenville Dam in Midland and Gladwin counties, citing years of failure by the dam's owners to address safety problems — especially the dam's ability to withstand a major flood.

52.     The Commission made several extensive attempts to ensure the Boyce corrected noncompliance issues at the Edenville Project since Boyce Hydro's acquisition of the license in 2004 – a period of over 14 years.[4]

53.     Of particular concern was the project's inability to pass the Probable Maximum Flood (PMF) 4 due to inadequate spillway capacity. The 2017 Compliance Order explained:

> Specifically, the Commission's Dam Safety Guidelines require that, if the failure of project works would present a threat to human life or would cause significant property damage, the project works must be designed to either withstand overtopping or the loading condition that would occur during a flood up to the probable maximum flood (PMF), or to the point where a failure would no longer constitute a hazard to downstream life and/or property. In the alternative, the capacity of the spillway must be adequate to prevent the reservoir from rising to an elevation that

---

[4] A detailed history of the events that have led us to this order can be found in the 2017 Compliance Order (Boyce Hydro Power, LLC, 159 FERC ¶ 62,292 (2017) (2017 Compliance Order) and in other Commission orders.

would endanger the safety of the project works. See Federal Energy Regulatory Commission, Engineering Guidelines for the Evaluation of Hydropower Projects, Chapter 2: Selecting and Accommodating Inflow Design Floods for Dams, at 2-3 (August 2015).[5]

54.    The Commission's Dam Safety Guidelines required the project works to be designed to safely handle a flood up to the PMF either by withstanding overtopping of the loading condition during such a flood or alleviating the risk such that dam failure would no longer constitute a hazard to downstream life or property.

55.    For years leading up to the current disaster, spillway capacity at the Edenville Project could only pass about 50 percent of the PMF.

56.    Boyce Hydro did not come into compliance. Accordingly, on February 15, 2018, the Commission issued an Order Proposing Revocation of the license pursuant to section 31(a) of the Federal Power Act (FPA), and, on September 10, 2018, the Commission issued an order revoking Boyce Hydro's license for the Edenville Project:

> **ORDER REVOKING LICENSE** (Issued September 10, 2018) This order revokes the license for the 4.8-megawatt (MW) Edenville Project No. 10808 (Edenville Project) pursuant to section 31(b) of the Federal Power Act (FPA).1 As discussed below, we take this action because of Boyce Hydro Power, LLC's (Boyce Hydro or licensee) longstanding failure to increase the project's spillway capacity to safely pass flood flows, as well as its failure to comply with its license, the Commission's regulations, and a June 15, 2017 Compliance Order issued pursuant to FPA section 31(a).

---

[5] 2017 Compliance Order, 159 FERC $ 62,292 at PP 2, 5-29, 146.

**B.**     <u>**Corporate Entity Activity and Loss of Corporate Liability Shield**</u>

57.     The Limited Liability Companies involved in this case, the "Boyce Defendants", were not properly maintained, or maintained for an improper purpose, including fraud, and all against public policy.

58.     Upon information and belief, Defendant Lee W. Mueller has operational control over Defendant Boyce Hydro Power, LLC; Defendant Boyce Hydro, LLC; Defendant Boyce Michigan, LLC; and Defendant Edenville Hydro Property, LLC (hereinafter collectively referred to as "Boyce Defendants") and used the companies interchangeably and as needed to exact his control over the Edenville Dam and related hydro project.

59.     To begin, the Edenville Dam was operated as hydroelectric project and pursuant to a license by FERC.

60.     Upon information and belief, Lee Mueller, and possibly other John Doe defendants, acted to transfer the license of that project among corporate entities they controlled, including those identified in FN No. 1 during the years preceding this incident.[6]

61.     Eventually in or around 2017, Boyce Hydro Power, LLC became the entity holding the license for the Edenville Dam.

62.     The license imposed significant obligations on the licensee, including:

---

[6] See FN No. 3.

The project, including its operation and maintenance and any work incidental to additions or alterations authorized by the Commission, whether or not conducted upon lands of the United States, shall be subject to the inspection and supervision of the Regional Engineer, Federal Energy Regulatory Commission, in the region wherein the project is located, or of such other officer or agent as the Commission may designate, who shall be the authorized representative of the Commission for such purposes. The licensee shall cooperate fully with said representative and shall furnish him such information as he may require concerning the operation and maintenance of the project, and any such alterations thereto, and shall notify him of the date upon which work with respect to any alteration will begin, as far in advance thereof as said representative may reasonably specify, and shall notify him promptly in writing of any suspension of work for a period of more than one week, and of its resumption and completion. The licensee shall submit to said representative a detailed program of inspection by the licensee that will provide for an adequate and qualified inspection force for construction of any such alterations to the project. Construction of said alterations or any feature thereof shall not be initiated until the program of inspection for the alterations or any feature thereof has been approved by said representative. The licensee shall allow said representative and other officers or employees of the United States, showing proper credentials, free and unrestricted access to, through, and across the project lands and project works in the performance of their official duties. The licensee shall comply with such rules and regulations of general or special applicability as the Commission may prescribe from time to time for the protection of life, health, or property.[7]

63.     As licensee for the Edenville Dam, which in turn operated as a public power generating facility and a major dam, Boyce Hydro Power, LLC assumed certain obligations to operate itself within the confines of acceptable public purpose and trust, including expressly, "protecting life, health and property".

---

[7] *Wolverine Power Corporation,* 85 FERC ¶ 61,063 (1998)

64.     In fact, upon information and belief, the only known and valid purpose to the continued existence of Boyce Hydro Power, LLC was as licensee of the Edenville Dam.

65.     However, Boyce Hydro Power, LLC acted improperly and in violation of its purpose, including specifically its public service context, to such an extensive, prolonged and significant degree to call into question whether it was used to subvert justice or cause a result that is contrary to some overriding public policy, to wit, the incident of May 19, 2020.

66.     Specifically, throughout the years leading up to 2018, the Edenville Hydroelectric Project No. 10808 was continuously under review by FERC, who in turn continually found them to be inadequately maintained and operated.

67.     By June 15, 2017 FERC issued a Compliance Order to Boyce Hydro Power, LLC, licensee for the Edenville Hydroelectric Project No. 10808, which identified several violations of the applicable license and regulations, including most pertinent to this case\, the following:

- The licensee is in violation of Article 4 for failing to follow directives from the Regional Engineer requiring the project to meet the Commission's guidelines for passing the PMF. Since acquiring the license in 2004, the licensee has not filed adequate plans, specifications, or designs as directed by the Regional Engineer for addressing spillway capacity concerns. The licensee is not exercising due diligence in acquiring a permit from the Michigan DEQ to complete the Tobacco auxiliary spillway at the west side of the project.

20

- The licensee performed unauthorized repairs to the right Tobacco abutment spillway wall in violation of Part 12 of the Commission's regulations. Specifically, the licensee violated section 12.10 of the Commission's regulations for not reporting the safety-related incident, section 12.11 for not reporting its modification to project works, section 12.4(b)(2)(ii) for not filing a report regarding the design and plans for the modification, section 12.40 for not filing a quality control inspection program for the modification, section 12.39(a) for failing to file a plan and schedule to address repair needs identified in the Part 12D report, and Article 4 of the project license for failing to follow the Regional Engineer's directives in addressing each of these violations. Even after violating the Commission's regulations and its license by performing the unauthorized repairs to the right Tobacco abutment spillway wall, and being informed by the Regional Engineer on September 9, 2015; June 8, 2016; and August 11, 2016 of the violations, the licensee proceeded with unauthorized repairs to the left Tobacco abutment spillway wall.

- The licensee performed a significant amount of unauthorized earth-moving activity as noted during an August 2014 Environmental Inspection of the project and as detailed by the Regional Engineer between March 2015 and June 2016, as discussed below. The licensee is in violation of Article 20 of its license for unauthorized clearing of lands, Article 21 for unauthorized dredging and filling of earth at the project, and Article 19 for failing to implement and maintain appropriate soil erosion control measures. The unauthorized earth-moving and land-clearing activities involved significant impacts to large areas of land above and beyond what would be involved in regular project maintenance given that little to no erosion control measures were employed and these activities created large areas of bare soil that were not revegetated. The licensee is also in violation of Article 4 for failing to follow the Regional Engineer's directives to cease earth-moving activity, ignoring certain directives, and failing to file soil erosion control plans.

- The licensee has failed to retain sufficient authority over project lands to ensure that it can carry out its responsibilities under the license. In order to comply with Article 5, the licensee must file with the Commission, a land ownership and property line map delineating all tax parcels within the project boundary. Accompanying the map, the licensee should file an excel

spreadsheet that labels: a) current land owner information (i.e., official name or title) for all parcels around the reservoir; and b) identification of the rights the licensee has to each parcel as labeled on the map (i.e., fee ownership, lease agreement, or easement) and the land parcels within the project boundary which the licensee currently does not have rights.

- In an environmental inspection report issued September 21, 2010, and in a follow up letter issued October 4, 2010, Commission staff required the licensee to provide final results of its water quality assessment, as annual water quality monitoring reports had not been filed since 2002.74 The licensee subsequently provided its 2012 water quality report to the Commission and the agencies on September 19, 2012. In a letter issued April 23, 2013, Commission staff concluded that the licensee was in violation of Article 402 and the project's approved Water Quality Monitoring Plan because the licensee failed to: (1) adhere to annual monitoring and reporting schedules, (2) describe whether mitigation measures were implemented and when conditions fell below specified criteria, and (3) connect monitoring equipment to the project's SCADA system. In the April 23, 2013 letter, staff also provided the licensee notice of the penalty provisions of section 31 of the FPA should it remain in non-compliance with its approved Water Quality Monitoring Plan.

68.    FERC concluded that Defendant Boyce Hydro Power LLC was

engaged in a pattern of conduct that was indifferent to consequences of a dam breach

and injury to human life and safety:

> The Commission's primary concern in this order is the licensee's longstandin failure to address the project's inadequate spillway capacity at this high hazard dam. Thirteen years after acquiring the license for the project, the licensee has still not increased spillway capacity leaving the project in danger of a PMF event. The licensee has shown a pattern of delay and indifference to the potential consequences of this situation. The spillway capacity deficiencies must be remedied in order to protect life, limb, and property. This order requires the licensee to design and construct two auxiliary spillways as risk

reduction measures and to file a plan and schedule for additional modifications to meet the full PMF.

69.     FERC described the abuses of its license as "**appalling**" stating as follows:

> The licensee has shown a persistent pattern of requesting additional time; missing deadlines; providing deficient designs, plans, and specifications; and has not shown due diligence obtaining a permit from the Michigan DEQ. Commission staff has worked with the licensee for 13 years in an attempt to get plans developed and implemented to meet the spillway capacity requirements. The Regional Engineer and staff have been very flexible, granting the licensee multiple extensions of time, allowing the licensee to switch its overall plans, and ultimately allowing the licensee to address the spillway capacity deficiencies in stages – starting with two auxiliary spillways. Despite this, the licensee is making no progress in advancing construction of even the initial risk reduction measure and its disregard for the severity of this situation is appalling.

70.     The facts and reasonable inferences support a finding that through its extensive, prolonged and significant operational failures, the Boyce Defendants were mere instrumentalities of Defendant Lee W. Mueller; (2) the Boyce Defendants were used to commit a fraud or wrong; and (3) the Plaintiffs and putative class suffered an unjust loss. *See Foodland Distribs. v. Al–Naimi*, 220 Mich.App. 453, 559 N.W.2d 379, 381 (1996) (citing *SDC Chem. Distribs., Inc. v. Medley*, 203 Mich.App. 374, 512 N.W.2d 86, 90 (1994)); see also *Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W. 371, 372 (1935).

71.     Furthermore, the facts and reasonable inferences support a finding that through its extensive, prolonged and significant operational failures, the Boyce Defendants were a sham, operated illegally and fraudulently. *Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704–05 (6th Cir. 1988).

72.     Upon information and belief, Defendant Boyce Hydro Power, LLC; Defendant Boyce Hydro, LLC; Defendant Boyce Michigan; and Defendant Edenville Hydro Property, LLC are undercapitalized and do not maintain the corporate formalities needed to shield Defendant Lee W. Mueller from individual liability for the harm caused to Plaintiffs and the unjust damages that they have suffered as a result of that harm.

73.     Accordingly, the corporate veil has been pierced and Defendant Lee W. Mueller can be held individually liable for the damages he has caused Plaintiffs. *See e.g., Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 799 (6th Cir. 2007).

74.     The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven. *Kline v. Kline*, 104 Mich.App. 700, 305 N.W.2d 297, 299 (1981) (per curiam).  However, the facts and reasonable inferences as are pleaded here and otherwise known publically support an equitable finding that Defendant Lee W. Mueller, who controlled the

entity defendants, along with any similarly situated John Doe Defendants, should not be shielded from personal liability.

## C.     Four Lakes Task Force

75.    Defendant Four Lakes describes itself as a "Task Force". From its website:

> The Four Lakes Task Force is a "Delegated Authority" formally created by resolutions passed in Midland and Gladwin counties to administer and oversee the maintenance and operations of the four dams and lakes, so the lake communities can enjoy the water long into the future.[8]

76.    Four Lakes also took it upon itself to provide public reports as to the Boyce Defendants activities with FERC, including a report on April 27, 2020 on Second Dam auxiliary spillway design. (*Id.*)

77.    Four Lakes held a public webinar on April 16, 2020 to replace of the planned physical meeting in conformance with the Stay-at-Home order. The purpose of the webinar was to:

- Adopt a resolution authorizing issuance of a bond anticipation note for the Four Lakes project

- Review the 2019 Annual Report and 2020 Operating Plan

78.    Four Lakes hosted copies of select Engineering Reports, Annual Report, News Letter and Flyers; Financing Meeting Presentation and Minutes; and

---

[8] http://www.four-lakes-taskforce-mi.com/about.html (last visited on 5-22-2020)

Special Assessment District Meeting Presentation and Minutes on its website.

79.    Archives of the nature, extent and volume of activities engaged in by Four Lakes is archived on their website. (*Id.*)

**D.    Events Following the Dam Failures**

80.    A Wednesday, May 20 letter from David Capka, director of the Division of Dam Safety and Inspections for FERC, directs Boyce Hydro Power, LLC to form the team to "undertake a forensic analysis of the root cause of the overtopping damage to Sanford Dam as well as any other contributing causes."

81.    In the letter, Boyce was also directed "to fully lower the reservoirs behind Sanford Dam, Smallwood Dam, and Secord Dam in a safe manner as flows recede. You are also directed to perform a dam safety inspection of these dams immediately and within 3 days after the flows recede."

82.    Neil Chatterjee, FERC Chairman, said in a statement the commission will send a staff engineer to the site to assist with the investigation, "when it is appropriate and safe to do so."

83.    During a Wednesday afternoon press conference, Midland City Manager Brad Kaye called it a dam failure by their standards, but officials will not be able to determine how much damage has taken place until the water recedes.

84.    "The water's coming at us, and that's close enough to call it a failure," he said. "What we're not entirely sure of (is) what the structure under that water

is, in other words how much of it is gone, how much of it is still there. That will in part dictate how the flood responds from this point forward."

85.   A Michigan State Police helicopter was monitoring and filming the river and structures Wednesday.

86.   Thousands of Class Members evacuated, or otherwise flooded form the events of May 19 remain bewildered at what has become of their homes, businesses and belongings.  They continue to recover and suffer loss.

**E.   Named Plaintiffs' Experiences**

87.   Plaintiffs are among the thousands class members who suffered tremendously from the above outlined failures and events.

88.   Plaintiffs Kimberly Borchard, Timothy Dana as homeowners in Sanford watched helpless as the floodwater rapidly overtook their property, washed away a boat lift and dock and yard destroyed. The pool was destroyed, along with hot tuib.

89.   Soon thereafter, the water began entering their home, destroying walls, floors, windows, doors, furniture, office equipment and personal property. And the house is no longer on waterfront property.

90.   The events interrupted their sense of wellbeing and sleep, and installed a lasting sense of anxiety and mental anguish.

91.    Plaintiff Holly Kovacs, as a renter, has a lease interest in her home. However, she experienced the same general series of events and losses. Her home is not even safe to enter and clean at this point do to the sever damage is sustained.

92.    Ms. Kovacs operated a business out of her home which is no longer operational.

93.    Ms. Kovacs evacuated her home as ordered by government officials.

## RULE 23 CLASS ACTION ALLEGATIONS

94.    Plaintiffs bring this action pursuant to Fed R. Civ. P. 23(b)(1)(2) and (3) on behalf of the following putative Classes.

The "Property Damage Class" defined as follows:

*All persons who suffered property damage as a result of the May 19th breach of the Edenville or Sanford Dams;*

The "Evacuation Class" defined as follows:

*All residents of Midland County with an interest in real property who evacuated their property as part of the Dam failures.*

95.    *Numerosity:* The putative Class members from are so numerous that joinder of all members in the case would be impracticable.

96.    *Commonality/Predominance:* There is a well-defined community of interest among Class members and common questions of *both* law and fact predominate in the action over any questions affecting individual members. These common legal and factual questions, include, but are not limited to, the following:

28

a.    Whether Defendants' owed a duty of care to the class members in operating the Edenville and Sanford dams; and if so whether that duty included operating and maintaining the dams in a reasonably safe manner prior to and including Tuesday May 19th 2020; and if so, whether one or more defendants breached a duty and proximately caused the dam failures as alleged and floodwater damages to the class;

b.    Why the Edenville and Sanford dams failed on Tuesday May 19th, including identifying any intervening and superseding causes;

c.    Whether the failure of the Edenville and Sanford dams on Tuesday May 19th was the result of unreasonable conduct by Defendants;

d.    Whether the Edenville and Sanford dams prior to and/or on Tuesday May 19th constituted an actionable nuisance under the laws of the state of Michigan;

e.    Whether the flood waters that resulted from the failure of the Edenville and Sanford dams on Tuesday May 19th constituted an actionable trespass under the laws of the state of Michigan;

f.    Whether the evacuation resulting from the dam failure and flood waters is compensable as an interface with the use and enjoyment of property, and if so, the criteria for qualifying for such compensation;

g.    Whether Defendant Lee W. Mueller is personally liable for his actions in operating, initiating litigation and administrative process and otherwise poorly

29

maintaining the Edenville and Sanford dams, including the resulting flood, evacuation and property damage resulting from the dam failures on Tuesday May 19th;

h.      What share of responsibility each Defendant, including Doe defendants 1-10 should bear for the losses resulting from the Tuesday May 19, 2020 flood and continued conditions existing for an unknown period of time thereafter;

i.      Whether declaratory relief is proper to remedy the conditions caused by, and still evolving, the Defendants, including abatement or other relief pursuant to MCL 600.2940; and

j.      Whether the financial assets and resources (including insurance) is insufficient such that prosecuting separate actions by or against individual class members would create a risk of:

(A)     Inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
(B)     adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

and risk inadequate or imbalanced compensate for the class for the harms, interference and damage resulting from the dam failures and resulting floodwaters such that a Rule 23(b)(1) class is proper and necessary.

97.    *Typicality:* Plaintiffs' claims are typical of claims of the Rule 23 Class they seek to represent in that Plaintiffs and all other members suffered damages as a direct and proximate result of Defendants' ownership of the dams and  conduct preceding Tuesday May 19, 2020. Plaintiffs' claims arise from Defendants' similar policies, practices, and course of conduct as all other Class members' claims and Plaintiffs' legal theories are based on the same or similar facts.

98.    *Adequacy:* Plaintiffs will fully and adequately protect the interests of the Rule 23 Class and have retained national counsel who are qualified and experienced in the prosecution of nationwide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Class.

99.    *Superiority:* A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because, *inter alia,* it is economically infeasible for the Rule 23 Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer.

100.   This case will be manageable as a Rule 23 Class action. Plaintiffs and their counsel know of no unusual difficulties in this case.

101.   Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.,*

559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

102.   Plaintiffs' and the Class have, and continue, to experience harms resulting from Defendants' negligence and the nuisance, including on ongoing and prolonged interference with their property rights.  Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Class and declaratory relief may also be appropriate in this case with respect to the Class members. Therefore Class certification pursuant to Rule 23(b)(2) may also appropriate, particularly as to an order to remediate or abate the conditions that caused the nuisance.

103.   Rule 23 (b)(1) applies when separate adjudications will create a risk of decisions that are either inconsistent with or dispositive of other class members' claims. This provision is only appropriate "when 'the party is obliged by law to treat the members of the class alike,' for example when the class touches upon how a utility company interacts with its customers or how the government imposes a tax." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 633 (6th Cir. 2011)(quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Here, Defendants were obligated to treat all class members alike vis-à-vis operating and maintaining the Dams.

104.    Similarly, a Rule 23(b)(1)(B) class action is only appropriate when the suit threatens to impair or dispose of the rights and interests of absent class members, as in the case where there is a limited fund available to pay damages. *See generally Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  Here, it stands to reason that the magnitude of the harm caused by Defendants will far outstrip their resources, and a Rule 23(b)(1) class may be the appropriate procedural method to ensure a fair allocation of the limited fund.

105.    Plaintiffs and the members of the Class have suffered damages as a result of Defendants' wrongful conduct as alleged herein, and are entitled to recover for those damages.  Furthermore, and absent representative action, Plaintiffs and the Class Members will continue to suffer losses,  thereby allowing these violations of law to proceed without remedy.

## CAUSES OF ACTION

### Count I – Negligence

106.    Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

107.    Defendants knew or should have known that the condition of the Edenville and Sanford dams prior to Tuesday May 19, 2020 was unreasonably dangerous and rendered them susceptible to breach, such that they were hazardous to residents within the potential flood area.

108.    The Dam failures and resulting events was reasonably foreseeable, and in fact predicted by FERC back in 2017, when they said:

> *Given Edenville dam's high hazard potential rating, the potential loss of life and destruction of property and infrastructure is grave should the project not be maintained and operated appropriately, with consequences that could certainly affect the Village of Sanford, Northwood University, City of Midland, Michigan, and other areas downstream.*

*and*

> *As mentioned earlier, the Edenville dam has a high hazard potential rating which means a failure of the project's works would create a threat to human life and/or would cause significant property damage.[9]*

109.    Defendants owed Plaintiffs and Class Members a general duty of care, which at minimum included duties to:

    a.    take all reasonable measures to ensure that the Dams were reasonably maintained, operated and within applicable safe standards;

    b.    warn Plaintiffs of the dangers that the Dams were insufficient to withstand rising water levels so they could take steps to prevent damage to their personal property and secure their real property premises with preventative measures such as generators, pumps and sand bags;

    c.    properly repair the faulty condition of the Dams to prevent the calamity that occurred on Tuesday May 19, 2020; and

    d.    comply with federal and state regulations and license requirements.

---

[9] See June 15, 2017 Compliance Order at p. 4

110. Defendant breached all duties by its actions and failure to act reasonable, including the above duties, while at the same time engaging in litigation for the purpose of avoiding repairs of the Dams.

111. As a direct and proximate result of Defendants' breaches, Plaintiffs' and Class Members' personal and real property have bene destroyed, lost or damaged, continue to be interfered with and will require extensive remediation. They have also suffered great emotional and mental distress.

112. As a direct and proximate result of Defendants' breaches, Plaintiffs and Class Members have suffered injury and damages, including, but not limited to, property loss – personal and real property; evacuation; emotional distress, diminution in the values of their properties, and related monetary damages associated with the flooding and evacuation.

113. In regard to Defendant Four Lakes specifically, and based on public discourse, Four Lakes *may* have possessed an ownership interest in the Dams as of the May 19th events, and as such shares responsibility for the liability as pleaded above. In other instances Four Lakes describes its position as having a tentative deal but no "title" to the Dams.

114. Aside from any ownership, through its activities, position, authority, purchase agreement and public representations, Four Lakes held itself out to the public as an authority on the Dams and source of information to Class Members;

and it was foreseeable that the public would look to Four Lakes as knowledgeable, rely and depend on them for information, including warnings about the status and safety of the Dams.

115.   By holding itself out as a knowledgeable authority Four Lakes assumed a duty of care to the public and putative class to act reasonably; including providing true an accurate information about the condition and safety of the Dams.

116.   Yet, despite Four Lakes being in possession of actual information, both public and private, that the Dams were unreasonably dangerous, posed a significant risk of failure, and would likely fail under the load of rainwater expected in Michigan springs, including specifically those leading up to the May 19th events, Four Lakes did noting to protect the Class Members, including provide warnings in the days and weeks leading up to the May 19th event.  In fact, Four Lakes claimed the Dams were perfectly safe.

117.   In fact, in a FAQ section of their website, Four Lakes advises the public that the dams are safe and fit.

Q.     Are the dams safe?

**A.     Yes. The dams are considered safe and fit for operation in the short-term.**

118.   Therefore, in addition to all the above acts of negligence applicable to all defendants, Four Lakes in specific, breached its duty of care and acted with

negligence with regard to its obligations to the class members; all of which was a proximate cause of damages and harm to the Class for which Defendant Four Lakes is liable.

### Count II – Nuisance

119.   Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

120.   The Dams, being in a prolonged state of disrepair, constituted a nuisance, both public and private and *per se*, under the laws of the state of Michigan. To wit, Defendants operation and maintenance of the Dams in the state that preceded and existed on Tuesday May 19, 2020 amounted to an activity or condition on one's own property, which activity over a substantial length of time or on successive and repeated occasions causes significant and substantial interference with the person, property, health, safety or comfort of others. Furthermore, once breached, the Dams deprived Defendants' neighbors of the reasonable and comfortable enjoyment and use of their property, violated the unwritten but accepted law of decency, and endangered the life and health of those neighbors. *Buckeye Union Fire Ins Co v. Michigan*, 383 Mich 630; 178 NW2d 476 (1970).

121.   Likewise the Dams subject Defendants to liability for private nuisance because (a) the Class Members have property rights and privileges in respect to the use of the enjoyment interfered with, (b) the invasion of flood waters results in

significant harm, (c) Defendants' conduct is the legal cause of the invasion, and (d) the invasion was either (i) intentional and unreasonable, or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct. *Adkins v. Thomas Solvent Co*, 440 Mich 293; 487 NW2d 715 (1992), citing 4 Restatement Torts 2d, §§821D-F, §822, pp 100-115; *Cloverleaf Car Co v. Phillips Petroleum Co*, 213 Mich App 186; 540 NW2d 297 (1995).

122.   As a public nuisance, the Dams caused (1) significantly interferes with the public's health, safety, peace, comfort, or convenience, (2) the failure was the result of Defendants violation of the law, including FERC rules and Defendants' license, and (3) the dams condition was known or should have been known to Defendants' to be of a continuing nature that produces a permanent or long-lasting, significant effect on the class real property rights.

123.   Plaintiffs and Class Members have been damaged by the nuisance, including but not limited to, (a) being evacuated from their residences; (b) losing the use and enjoyment of their properties during the evacuation, or period of flooding and until remediation occurs; (c) the inability to avail themselves of their properties' value as an asset and/or source of collateral for financing; and (d) damage to real and person property. *Adkins v. Thomas Solvent Co*, 440 Mich 293; 487 NW2d 715 (1992).

124.   The interference was unreasonable, substantial in nature and has caused significant harm.

125.   Defendants exercised sufficient ownership and/or control over the Dams such that they are culpable and liable for nuisance related damages and interference, including as to Plaintiffs and the putative classes.

126.   To the extent any Defendant is considered a governmental entity, the Dams and the above events and actions constitute valid exceptions to government immunity, including maintenance of a public building, pecuniary activity, mainatence of a public highway and trespass nuisance.

## Count III – Trespass

127.   Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

128.   Defendants' caused an invasion of Class Members property, without consent, and in a harmful manner when the floodwaters encroached the subject real property.

129.   Surface water diversion is a physical invasion actionable as a trespass under Michigan law. *Kernen v. Homestead Development Co*, 232 Mich App 503; 591 NW2d 369 (1998).

130.   Defendants are liable for trespass and the resulting harm and damages it caused to Class Members for the May 19th Dam failures and resulting floodwaters

## Count IV – Strict Liability

131.   Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

132.   Defendants operation and prolonged poor maintenance of the Dams, together with amount of water involved, amounted to an abnormally dangerous activity for which strict liability attaches.  *See* 3 Restatement Torts 2d, §519, pp 34-36; Prosser & Keeton, Torts (4th ed) §78, pp 513-514.

## Count V – Intentional Infliction of Emotional Distress

133.   Plaintiffs and Class Members incorporate the preceding paragraphs by reference as if fully set forth at length herein.

134.   Defendants acted knowingly throughout the years preceding the May 19, 2020 Dam failures, and as such Defendants' conduct was extreme and outrageous.

135.   Defendant operated with intent and or extreme recklessness with regard to the safety and health of Class Members, their property and the environment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Rule 23 Classes, request judgment as follows:

a.   Certifying this action as a class action pursuant to Rule 23(b)(1)(2) and/or (b)(3) with respect to Plaintiffs' claims;

b.   Designating named Plaintiffs as the representatives of the Rule 23 Class, and undersigned counsel as Class counsel for the same;

c.   Declaring Defendants' Dams a nuisance and the resulting floodwaters a trespass, for the reasons stated herein;

e.   Declaring Defendants' conduct to be negligent and/or willful and holding them liable for class members' damages;

f.   Declaring remediation of class members' property and abatement relief for the class or other relief pursuant to MCL 600.2940;

g.   Creating a limited fund pursuant to FRCP 23(b)(1) to preserve and fairly allocate the limited resources Defendants may possess;

h.   Granting judgment in favor of Plaintiffs and against Defendants and awarding Plaintiffs and the Rule 23 Class the full amount of damages available by law, including medical expenses; earnings loss; other expenses; mental anguish; property damage; diminution in the value of realty, including lost rent; incidental and consequential damages, including to businesses; and treble damages under MCL 600.2919;

i.   Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by Rule 23;

j.   Awarding pre- and post-judgment interest to Plaintiffs on these damages; and

41

k.      Awarding such other and further relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure with respect to the above-entitled cause.

**SOMMERS SCHWARTZ, P.C.**

By: *<u>/s/ Jason J. Thompson</u>*
Jason J. Thompson (P47184)
Elaina S. Bailey (P82461)
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
jthompson@sommerspc.com
ebailey@sommerspc.com

*Attorney for Plaintiffs and the Putative Class Members*